UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HERITAGE FOUNDATION, et al., | ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civil Action No. 1:24-CV-00053-MN |
| U.S. DEPARTMENT OF JUSTICE, | ) ) ) |
| Defendants. | ) ) |

### DECLARATION OF KARA CAIN

Pursuant to 28 U.S.C. § 1746, I, Kara Cain, declare the following to be a true and correct statement of facts:

1. I am an Attorney-Advisor with the Freedom of Information Act/Privacy Act ("FOIA/PA") staff of the Executive Office for United States Attorneys ("EOUSA"), United States Department of Justice ("DOJ"). In my capacity as Attorney-Advisor, I act as a liaison with other divisions of DOJ in responding to requests and litigation filed under both FOIA, 5 U.S.C. § 552, and the Privacy Act of 1972, 5 U.S.C. §552a. I also review FOIA/PA requests for access to records located in this office and the 94 districts of the United States Attorney's Offices ("USAOs") and the case files arising therefrom, review correspondence related to requests, review searches conducted in response to requests, and prepare EOUSA responses to ensure compliance with FOIA/PA regulations, 28 C.F.R. §§ 16.3 *et. seq.* and §§ 16.40 *et seq.*, and 5 U.S.C. § 552 and 5 U.S.C. § 552a.

2. Due to the nature of my official duties as Attorney-Advisor, I am familiar with the procedures followed by this office in responding to the FOIA request from Plaintiffs, Heritage Foundation et al. Additionally, I have reviewed the complaint which this Declaration addresses.

3.  The purpose of this Declaration is to provide the Court with information regarding EOUSA's response to Plaintiffs' FOIA request.

4.  The statements contained in this Declaration are based upon my personal knowledge, information provided to me by knowledgeable persons in my official capacity as an Attorney-Advisor, and conclusions and determinations reached and made in accordance therewith.

## I. ADMINISTRATIVE HISTORY

5.  On August 15, 2023, EOUSA received a FOIA request from Heritage Foundation, which had been sent to USAO-Delaware ("USAO-DE"). *See* Compl. Ex. 1 (Jan. 15, 2024), D.I. #1-1. The FOIA request sought all records "relied upon" by David Weiss in making the following statements:

> 1. "I want to make clear that, as the Attorney General has stated, I have been granted ultimate authority over this matter, including responsibility for deciding where, when, and whether to file charges and for making decisions necessary to preserve the integrity of the prosecution, consistent with federal law, the Principles of Federal Prosecution, and Departmental regulations."
>
> 2. "As the U.S. Attorney for the District of Delaware, my charging authority is geographically limited to my home district. If the venue for a case lies elsewhere, common departmental practice is to contact the United States Attorney's Office for the district in questions and determine whether it wants to partner on the case."
>
> 3. "Here, I have been assured that, if necessary after the above process, I would be granted § 515 Authority in the District of Columbia, Central District of California, or any other district where charges could be brought in this matter."
>
> 4. "[I]n this case, I have not requested Special Counsel designation pursuant to 28 CFR § 600 et seq. Rather, I had discussions with Departmental officials regarding potential appointments under 28 U.S.C. §515, which would have allowed me to file charges in a district outside my own without the partnership of the local U.S. Attorney. I was assured that I would be granted this authority if it proved necessary. And this assurance came months or before the

October 7, 2022, meeting referenced throughout the whistleblowers' allegations."

5. "In this case, I've followed the process outlined in my June 30 letter and have never been denied the authority to bring charges in any jurisdiction."

6. EOUSA assigned the request number EOUSA-2023-002939 and on August 18, 2023, acknowledged receipt of the request via letter. *See* Compl. Ex. 20 (Jan. 15, 2024), D.I. #1-20.

7. EOUSA produced to Plaintiffs responsive records in four tranches, on April 15, May 30, September 4, and October 25, 2024.

8. The first interim response consisted of six pages released in full, 18 pages released in part, and 227 pages withheld in full. *See* Ex. 1.

9. The second interim response consisted of seven pages released in full and one page released in part. *See* Ex. 2.

10. The third final response consisted of 18 pages withheld in full. *See* Ex. 3.

11. The fourth response consisted of four pages re-released (LITG-2024-000006_007, _013, _014, and _016) and four pages released anew (LITG-2024-000006_008_001–02, _012_001, and _033. *See* Ex. 4.

12. Overall, EOUSA has reviewed more than 4,000 potentially responsive pages and released—in whole or in part—all responsive, non-exempt records therein.

## II. RE-REVIEW OF RECORDS

13. In preparation for this declaration, I have re-reviewed every record released in full, released in part, and withheld in full in this case.

14. Upon further review, one of the records produced in part (LITG-2024-000006_29) was not responsive to Plaintiffs' request. The email chain merely forwarded the *final* version of the June 30, 2023 response to Chairman Jordan and thus could not have been "relied upon" when

3

drafting said response. That record should, therefore, be treated as a discretionary release by the Department.

15. Upon further review, 23 records (80 pages) withheld in full were deemed not responsive to Plaintiffs' request.

16. Upon further review, 9 records (40 pages) withheld in full were deemed wholly duplicative of other records that were withheld in full.

17. Upon further review, two "records" (three pages) were inadvertently withheld in full but were, in fact, parts of other records that had been released in part. The first example, since released in part as LITG-2024-000006_012_001, is the second page of an email originally produced as LITG-2024-000006_012. The second example, since released in part as LITG-2024-000006_008_001–02, comprises the second two pages of an email originally produced as LITG-2024-000006_008.

18. Upon further review, one record (one page) was inadvertently withheld in full because the body of the email is a verbatim copy of the attached draft letter. That cover email has since been released in part as LITG-2024-000006_033.

19. As a result of this further review, the Department's updated total for pages withheld in full and in part is as follows: the Department is withholding 22 pages in part and 121 pages in full. All 143 pages are addressed on the accompanying *Vaughn* index.

### III. ISSUES FOR BRIEFING

20. The Parties agreed to resolve two issues without litigation.

21. First, Plaintiffs are not challenging the adequacy of the Department's search.

22. Second, Plaintiffs are not challenging the Department's withholding of four categories of information: (1) names of congressional Staffers; (2) names of Delaware U.S. Attorney's Office employees junior to the Criminal Chief; (3) names of other DOJ employees

who are in non-supervisory, non-public-facing roles; and (4) email addresses, phone numbers, or physical addresses.

23. Thus, this declaration and the accompanying *Vaughn* index addresses only those withholdings that fall outside the preceding categories.

## IV. RELEVANT FOIA EXEMPTIONS

**EXEMPTION 5 (5 U.S.C. §552(B)(5))**

24. The Department is withholding 14 pages of records in part, and 95 pages of records in full, under FOIA Exemption 5, 5 U.S.C. § 552(b)(5).

25. Exemption 5 covers "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). As discussed in detail below, the information withheld by EOUSA, in whole or in part, pursuant to FOIA Exemption 5 falls squarely within the attorney-work-product or deliberative-process privileges. These privileges will be discussed in turn.

### Exemption 5: Attorney Work-Product Privilege

26. The attorney work-product privilege incorporated into Exemption 5 serves to protect materials prepared by an attorney, or others at the direction of an attorney, in anticipation of litigation. This privilege preserves the adversarial trial process by shielding materials that would disclose the attorney's case theory or trial strategy. The attorney work-product privilege protects and insulates the attorney's preparation in anticipation of litigation.

### Exemption 5: Deliberative Process Privilege

27. The purpose of the deliberative process privilege is to protect the integrity of the internal decision-making process by shielding this process from public scrutiny for the purpose of enhancing the quality of agency decision-making. For information to be withheld pursuant to

the deliberative process privilege, the information at issue must be both "pre-decisional" and "deliberative" in nature.

**EXEMPTION 6 (5 U.S.C. § 552(B)(6))**

28. The Department is withholding from 13 records the names of two employees of the U.S. Attorney's Office under Exemption 6, 5 U.S.C. § 552(b)(6).

29. Exemption 6 protects from disclosure of records related to "personnel and medical files and similar files," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. 5 U.S.C. § 552(b)(6). The term "similar files" is broadly construed to include "[g]overnment records on an individual which can be identified as applying to that individual." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982); *Lepelletier v. Fed. Deposit Ins. Corp.*, 164 F.3d 37, 47 (D.C. Cir. 1999). In assessing the applicability of Exemption 6, courts weigh the "privacy interest in non-disclosure against the public interest in the release of the records in order to determine whether, on balance, the disclosure would [cause] a clearly unwarranted invasion of personal privacy." *Lepelletier*, 164 F.3d at 46; *Chang v. Dep't of Navy*, 314 F. Supp. 2d 35, 43 (D.D.C. 2004). Plaintiffs bear the burden of establishing that disclosure will advance the public interest. *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 158 (2004). "[T]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties or otherwise let citizens know 'what their government is up to.'" *Lepelletier*, 164 F.3d at 47; *Beck v. Dep't of Just.*, 997 F.2d 1489, 1492 (D.C. Cir. 1993).

**EXEMPTION 7(A) (5 U.S.C. §552(B)(7)(A))**

30. The Department is withholding 21 records in part under FOIA Exemption 7(A).

31. FOIA Exemption 7(A) protects records or information "compiled for law enforcement purposes" when disclosure "could reasonably be expected to interfere with

enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). Information may be withheld pursuant to Exemption 7(A) where it is established that (1) the information relates to pending or prospective investigations or other enforcement proceedings, and (2) disclosure of the information could reasonably be expected to interfere with the identified enforcement proceedings.

**EXEMPTION 7(E) (5 U.S.C. §552(b)(7)(E))**

32. The Department is withholding one record in part under FOIA Exemption 7(E). *See Vaughn* Index No. 15.

33. FOIA Exemption (7)(E) provides for withholding of information that, if released, "would disclose techniques and procedure for law enforcement investigations or prosecutions or would disclose the guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). That exemption affords categorical protection to techniques and procedures used in law enforcement investigations. It protects techniques and procedures that are not well-known to the public, as well as non-public details concerning the use of publicly-known techniques and procedures.

## V. FORESEEABLE HARM

34. The Department may only withhold a record or information under one of FOIA's exemptions if the Department "reasonably foresees that disclosure would harm an interest protected by an exemption." 5 U.S.C. § 552(a)(8)(A)(i)(I). The application of the foreseeable harm standard is discussed herein as to each withholding, or category of withholdings, asserted by the Department.

## VI. RECORDS WITHHELD IN PART OR IN FULL

35. The accompanying *Vaughn* index describes all withholdings by the Department that were not resolved by the Parties. Those withholdings are further justified as follows:

**A.  DRAFT CONGRESSOINAL CORRESPONDENCE**

36. The Department withheld in full 10 records (30 pages) consisting of draft responses to requests from Congress for information about the Hunter Biden investigation. These drafts would ultimately become the June 7, June 30, and July 10, 2023 letters at the heart of Plaintiffs' FOIA request.

37. All drafts were withheld in full under the deliberative process privilege, which has long been held to shield deliberations in the Executive Branch about how to respond to Congress. I verified that all drafts are "intra-agency memorandums or letters" within the meaning of 5 U.S.C. § 552(b)(5).

38. By their nature, drafts of ultimate responses are inherently predecisional. Nevertheless, every draft was individually reviewed to ensure that it did, in fact, precede the ultimate response to Congress.

39. By their nature, drafts are also inherently deliberative, insofar as they are merely *potential* ways to answer congressional requests. Nevertheless, I reviewed every draft to ensure that it was deliberative in nature—that is, that the author(s) or editor(s) were proposing whether and how to respond to the pertinent request(s) from Congress. These drafts were circulated among Department employees for review and reflect an important part of the Department's deliberative decisionmaking process. Over the course of creating the final June 7, June 30, and July 10 letters, drafts were transmitted back and forth, continually changing as relevant staff made edits and contemplated strategies as they work toward a well-reasoned, final product.

40. Certain drafts are denoted as "redline" drafts in the accompanying *Vaughn* index. That indicates that the record contains "tracked changes" made using Microsoft Word's editing

function. Those "tracked changes" included both line edits to the drafts and comments from authors and reviewers. I confirmed that both "redline" and "clean" drafts were equally predecisional and deliberative in nature.

41. Releasing any of these drafts would harm interests protected by the deliberative process privilege. The D.C. Circuit has identified at least three purposes underlying that privilege: "First, [the privilege] protects creative debate and candid consideration of alternatives within an agency, and, thereby, improves the quality of agency policy decisions. Second, it protects the public from the confusion that would result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon. Third, it protects the integrity of the decision-making process itself by confirming that 'officials should be judged by what they decided(,) not for matters they considered before making up their minds.'"[1]

42. Those protections would be undermined by disclosure here. If employees knew that their drafts would later be published in response to FOIA requests, those employees would be less inclined to be candid and forthcoming in those drafts. The authors might deviate from what they believe to be the best response because disclosure would expose them personally to unwanted attention, harassment, etc.

43. Likewise, the editing process would suffer because—knowing that they would later be disclosed through FOIA releases—reviewing employees may refrain from offering their true opinions. It is critical to effective and sound Department decisionmaking that agency staff feel free to work through, write out, analyze, and hone their analysis, and share that analysis with decisionmakers. Without this fulsome decisionmaking process, the Department's ability to craft a well-reasoned response to Congressional inquiries would be compromised to its detriment. It

---

[1] *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (*quoting Jordan v. U.S. Dep't. of Just.*, 591 F.2d 753, 772-773 (D.C. Cir. 1978)).

is more than reasonably foreseeable that this chilling effect would ensue should pre-decisional, deliberative drafts be disclosed.

44. Finally, I reviewed every withheld draft to determine whether any portion(s) might reasonably be segregated and released. None could be. The drafts are, as noted above, inherently predecisional and deliberative. No part of them could reasonably be segregated and released without disclosing what the Department (or its employee(s)) was planning to say at the time of the draft. The drafts were, therefore, appropriately withheld in full.

**B.      DISCUSSIONS ABOUT DRAFT CORRESPONDENCE**

45. The Department withheld in part eight records containing internal communications in which Department employees discussed how to respond to congressional requests. The specific basis for each withholding is explained in the accompanying *Vaughn* index.

46. Most of the information was withheld under Exemption 5; specifically, the deliberative process privilege. Accordingly, I reviewed every partial withholding under that privilege to confirm that it was predecisional—*i.e.*, that it preceded the ultimate response to which it pertained).

47. I also reviewed every partial withholding to confirm that it was deliberative—*i.e.*, that it reflected one or more employees' thoughts, suggestions, or discussions, about how to respond. The deliberative nature of the withheld information is described, to the extent possible without revealing the privileged information, on the accompanying *Vaughn* Index.

48. For the same reasons discussed above, releasing communications about draft responses to Congress would harm interests protected by Exemption 5. The sender of an email, no less than the author of (or a contributor to) a draft letter, would be chilled from offering frank advice if he or she knew that it would later be published in response to a FOIA request.

Disclosure of these back-and-forth discussions taking place over email in real time as the Department prepares its response to Congress would hamper the efficient day-to-day workings of the Department. Instead of providing frank analysis and input over email, employees would turn to other, less efficient means to provide feedback and analysis, such as organizing lengthy meetings or phone calls to share opinions and analysis. As with the drafts themselves, releasing this correspondence would seriously impair the Department's ability to foster forthright, internal discussions necessary for efficient and proper Departmental decision-making.

49.     Many of the withheld portions also discuss the process by which the Department responded to the congressional inquiries in question. The withheld information includes which employee(s) drafted and which Department components reviewed certain responses; when and why that drafting and reviewing took place; and how those responses were delivered to the inquiring Member(s) of Congress. These process choices, too, are necessarily deliberative: the Department may have reasons, for example, to circulate draft correspondence to certain components. And releasing those choices would chill the agency from making them in the future, which would contravene the deliberative process privilege's goal of improving agency decisionmaking. Thus, for example, the Department's ultimate decision might not benefit from a certain component's input.

50.     As with the draft letters, I carefully reviewed every partial withholding under Exemption 5 of communications about draft congressional correspondence to ensure that nothing could reasonably be segregated and released. That resulted in three pages re-released on October 25, 2024, withdrawing some of EOUSA's prior redactions.

**C.    HANDWRITTEN NOTES BY ATTORNEYS ASSIGNED TO THE HUNTER BIDEN INVESTIGATION**

51.    The Department withheld in full 21 records (69 pages) consisting of handwritten notes taken by U.S. Attorney David Weiss and an Assistant U.S. Attorney at the U.S. Attorney's Office in Delaware.

52.    These records are withheld under multiple exemptions, which overlap in substantial part.

**1.    Attorney Work Product**

53.    These notes were withheld in full under the attorney work product privilege of Exemption 5. I have reviewed every page of every withheld record to confirm that these records meet the threshold requirements of work product: they were drafted by an attorney and related directly to ongoing or imminent litigation, primarily the investigation and prosecution of Hunter Biden.

54.    The notes also address subjects, described in detail in the accompanying *Vaughn* Index, that fall squarely within the work product privilege. They memorialize investigative steps taken and evidence gathered. The notes suggest, and record others' suggestions about, potential strategies in effectuating criminal investigations and prosecutions—including which charges to pursue, against whom, when, and where. The notes contemplate potential defenses and how to negate them. The notes further evaluate strengths and weaknesses in the government's case and propose means to address the same. Finally, the notes reflect meetings held between the notetakers and employees of other Department components with whom the U.S. Attorney's Office coordinated on the relevant congressional responses and on the criminal proceedings more generally.

55.    The handwritten notes in this case are classic forms of attorney work product. While I cannot catalogue every subject of the withheld notes without revealing the privileged

information itself, I have confirmed that all withheld records of notes contain an attorney's thoughts and mental impressions as they pertained to ongoing or imminent litigation.

56. Releasing any of those notes would harm interests protected by the attorney work product privilege encompassed by Exemption 5. "The attorney work-product privilege 'provides a working attorney with a 'zone of privacy' within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories.'"[2] I have carefully reviewed every page of the withheld notes and can confirm that releasing any of them would invade this "zone of privacy" and thus undermine the privilege.

57. Furthermore, as with the deliberative process privilege, foreknowledge that their notes would be released to the public through FOIA would chill Department employees from taking such notes in the first place—impairing the adversarial system that the privilege is meant to preserve. No prosecutor would offer candid evaluation of his or her evidence—literally cataloguing the weaknesses in his or her own case—if he or she knew that those notes would be made public. Nor would prosecutors name witnesses or otherwise expose the sources of their evidence if those sources would later be made public. And yet there is a strong public interest in allowing prosecutors and investigators to take these sorts of notes, as they contribute to more just and efficient outcomes in the criminal justice system. Indeed, the work product privilege exists precisely to encourage this sort of notetaking.

58. As noted above, I reviewed every page of all withheld notes to confirm that they are attorney work product. Accordingly, I can confirm that no portion of those notes can reasonably be segregated and produced. Releasing *any* of an attorney's notes to the public would seriously undermine the attorney's role in our adversarial system by chilling the full, unvarnished transcription of the attorney's thoughts and evaluation of the case.

---

[2] *Reporters Comm. For Freedom of the Press v. U.S. Customs & Border Prot.*, No. 18-cv-00155 (TNM), 2021 WL 4843870, at *5 (D.D.C. Oct. 18, 2021).

### 2. Deliberative Process Privilege

59. These notes are also withheld under the deliberative process privilege. They reflect, in part, the Department's deliberations over how to respond to congressional inquiries. That is why they are responsive in the first place. For that reason, however, they are privileged for the same reasons as explained above in the "congressional correspondence" sections. Releasing these attorney notes would harm the same interests described in those sections.

60. The attorney notes also pertain to deliberations beyond congressional correspondence. For example, many of these attorney notes were taken at meetings where case team members discussed next steps on a criminal investigation. Revealing those deliberations would chill such employees from offering their advice at a meeting where an attorney was taking notes. Prosecutors would hesitate to offer reasons how a question should be answered if they knew that those recommendations would later be published. Therefore, these portions of the notes fall within the protection of the deliberative process privilege in addition to being properly withheld in full as attorney work product.

61. I have reviewed all portions of the handwritten attorney notes that are deliberative, or that reflect deliberations, and have determined that none of those portions can reasonably be segregated and released.

### 3. Exemption 7(A)

62. In addition to being withheld in full pursuant to the attorney work product, and in significant part under the deliberative process privileges, these notes contain additional information properly withheld under Exemption 7(A). I have confirmed that all such information was "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7)(A).

63. As discussed above, the notes do not relate exclusively, or in some cases even predominately, to Congressional inquiries and responses. They also reflect Department

employees' deliberations over what steps to take in ongoing criminal proceedings. As previously discussed, the notes reflect evidentiary and procedural issues pertaining to those proceedings. The Department reasonably expects that, if released, that information could be used to interfere with ongoing criminal proceedings. If someone learned what information had been gained from a particular witness, for example, the witness might suffer harassment, threats, or intimidation. Physical or documentary evidence, once declared to the public, might be destroyed, hidden, or otherwise tampered with. Additionally, if future investigative/prosecutorial steps were made known, the subjects or targets of those investigations or prosecutions could take steps to avoid them.

64. I have reviewed all information within these attorney notes withheld under Exemption 7(A) and confirmed that none of it could reasonably be segregated and released.

D. **NAMES OF DEPARTMENT OF JUSTICE EMPLOYEES**

65. As indicated on the accompanying *Vaughn* index, the Department withheld from 13 records the names of two employees of the U.S. Attorney's Office and from one record the name of an EOUSA attorney. These three names were withheld under FOIA Exemption 6.

66. Department employees who have been associated with the Hunter Biden investigation have been subjected to harassment and threats, including threats to their (and their families') physical safety. As recently as July, employees of the U.S. Attorney's Office were doxed—that is, they had personal contact information, including home and email addresses, social media account information, and family members' workplace information publicized online.

67. The letters, emails, and calls received by the District of Delaware about the Hunter Biden investigation vary from expressing discontent for the way the district has handled the underlying investigation to outright threats of physical violence. A few threats have escalated

to the level of requiring referrals to the United States Marshals Service and the Federal Bureau of Investigation ("FBI") for threat assessment and potential action. One threat against an FBI agent resulted in an arrest and is being prosecuted.[3]

68. It is reasonably foreseeable that any of the three individuals, if their names were disclosed, would be exposed to further threats or harassment. They have a significant privacy interest, therefore, in their names being withheld under Exemption 6.

69. There is no countervailing public interest sufficient to obtain these employees' names. Mr. Weiss ultimately signed the three letters relevant to Plaintiffs' FOIA request. Whatever public interest remains in learning who assisted in the drafting process is grossly outweighed by the ongoing privacy interests of those employees in maintaining their physical and emotional safety and, to the extent possible, avoiding additional harassment or potential physical injury.

70. Any public interest in learning the EOUSA attorney's name is particularly minimal because, as explained in the following section, the email that attorney sent did not relate to the three letters at issue in Plaintiffs' FOIA request.

E.   **OTHERWISE EXEMPT INFORMATION**

   1.   **EOUSA Email Unrelated to Mr. Weiss's Congressional Correspondence**

71. The Department withheld two distinct portions of a June 30, 2023 email from an EOUSA employee. *See Vaughn* Index No. 11 at LITG-2024-000006_014. As noted in the *Vaughn* Index, the first withholding consists of attorney work product, insofar as the withheld information comprises legal advice given to Mr. Weiss by an attorney at EOUSA. Releasing that attorney's work product would harm an interest protected by Exemption 5—essentially, for the same reasons given above about the handwritten attorney notes. I re-reviewed this withholding to

---

[3] https://www.justice.gov/usao-ndtx/pr/fort-worth-man-charged-threatening-federal-agent-gunswill-come-out (June 13, 2024).

determine that no portion could reasonably be segregated and produced—that is, that the entire passage is work product and that releasing any of it would harm the interests protected by Exemption 5.

72. The second redacted portion of the June 30, 2023 EOUSA email is also withheld under Exemption 5 as part of an agency's deliberative process. Further information as to this withholding is provided in the accompanying *Vaughn* index. Releasing part of that agency's deliberative process would chill frank deliberations in the future—as explained with respect to the congressional correspondence above. This deliberation was over another agency's investigative requests and how they might be fulfilled in accordance with Federal Rule of Criminal Procedure 6(e)—a rule with which the Executive Branch has a strong interest in complying. It is critically important, therefore, that Executive Branch agencies be able to deliberate in a free and open matter about such subjects. I have re-reviewed the work product withheld on page LITG-2024-000006_014 and determined that no portion of it could reasonably be segregated and released.

### 2. Email from Mr. Weiss to Himself

73. The Department withheld in part an email from Mr. Weiss to himself with the subject "Special Counsel." *See Vaughn* Index No. 9 ("LITG-2024-000006_012"). The body of the email was redacted in full under FOIA Exemptions 5 (as attorney work product) and 7(A).

74. This email constitutes Mr. Weiss's work product relating to potential appointment as a Special Counsel, including potential investigative and policy rationales for such an appointment. Those considerations included sensitive, non-public information about the Hunter Biden investigation and Mr. Weiss's impressions of the same.

75. I have reviewed this record and confirmed that releasing any part of it would necessarily reveal Mr. Weiss's thinking about the given topic, which would harm the interests at

the core of the work product privilege (explained above). Accordingly, the body of the email is withheld in full as attorney work product.

77. The email from Mr. Weiss to himself is the electronic equivalent of the handwritten notes described above. As with many of those notes, this email contains sensitive information about the nature and status of the Hunter Biden investigation. For the same reasons explained in Section VI.C.3. above, releasing that information could reasonably be expected to interfere with further proceedings.

### 3. Internal Filename Referring to Hunter Biden Investigation

77. The Department withheld part of one record under Exemption 7(E): a filename used to reference the Hunter Biden investigation. Releasing the internal filename could compromise sensitive methods and techniques of law enforcement activities. Anyone who knew the filename could associate other records or information bearing that name to this investigation—a link that would not otherwise be apparent. And that link could be used to discern the techniques and procedures used to investigate, which is precisely the interest that Exemption 7(E) protects. Because disclosing the filename would harm that interest, and cannot reasonably be segregated and released, it was properly withheld.

### 4. Reference to Family Member of U.S. Attorney's Office Employee

78. The Department withheld from one record a reference to the family member of a U.S. Attorney's Office employee. *See Vaughn* Index No. 13 (LITG-2024-000006_018). That reference was withheld under Exemption 6.

79. The family member was only mentioned to give context for the employee's availability. Thus, the employee continues after the redacted portion: "so I have to head home. I will be available by phone tonight and, per usual, will be up early tomorrow if you need me."

There is no public interest in learning the family member's name or the circumstances that caused the employee's brief unavailability one afternoon.

80. In contrast, the family member has an extremely high privacy interest in not being associated with highly publicized criminal proceedings in which the family member played no part. As noted above, Department employees have been subjected to threats and harassment—including the doxing of their family members. It is more than reasonable to assume that such family members, if they were named in public records, would suffer the same.

81. Given the absence of any public interest, and a particularly acute privacy interest, the reference to this family member was withheld.

## CONCLUSION

82. EOUSA released all reasonably segregable, non-exempt information from records responsive to Plaintiffs' FOIA request and has properly withheld information pursuant to FOIA exemptions 5 U.S.C. § 552(b)(5), (b)(6), (b)(7)(A), and (b)(7)(E).

83. Each step in the processing of Plaintiffs' request has been consistent with EOUSA's procedures, which were adopted to ensure an equitable response to all persons seeking responsive records under the FOIA/PA.

84. Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed this 25th day of October, 2024.

_____
Kara Cain
Attorney-Advisor
Executive Office for United States Attorneys
Freedom of Information/Privacy Act Staff